**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 04-cv-00243-REB-BNB

ROBERTA FOLKS,

    Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation,

    Defendant.

**FINDINGS OF FACT & CONCLUSIONS OF LAW
AND ORDER OF REFORMATION**

**Blackburn, J.**

    On September 4 - 5, 2012, this matter came before me for trial to the court on the plaintiff's claim for reformation of an insurance contract. Resolution of the date of reformation affects the viability of plaintiff's remaining state law claims. The September 4 - 5, 2012, trial concerned only the reformation issues.

    Having judicially noticed all relevant adjudicative facts in the file and record of this action; having considered the stipulations of the parties; having considered the evidence educed at trial; and having considered the arguments advanced and the authorities cited by the parties during pretrial proceedings and at trial, I enter the following statement of jurisdiction, findings of fact – which are supported by a preponderance of the evidence – conclusions of law, and orders.

    The timing of certain developments in the applicable case law is relevant to the determination of a reformation date. Because this timing is critical, I include a

discussion of this case law under the heading of "Findings of Fact." Some of that discussion constitutes combined or mixed findings of fact and conclusions of law.[1]

## I. JURISDICTION & CONTROLLING LAW

This Court has jurisdiction over this case under 28 U.S.C. § 1332 (diversity). Colorado law controls the resolution of the substantive issues in this diversity case. ***Erie Railroad Co. v. Tompkins***, 304 U.S. 64, 78 (1938); ***Royal Maccabees Life Insurance Co. v. Choren***, 393 F.3d 1175, 1180 (10th Cir. 2005).

## II. FINDINGS OF FACT

### A. Ms. Folks' Accident, the Applicable Policy, and Benefits Paid

1. On April 4, 1998, the plaintiff Roberta Folks was a pedestrian standing in a parking lot when she was struck by the left side mirror of a 1997 Plymouth Neon driven by Charles McCune.

2. Mr. McCune insured the Neon under a policy issued by the defendant State Farm Mutual Automobile Insurance Company (State Farm). The Declarations Page of the McCune insurance policy indicates that the policy first was effective for the period from June 17, 1997, through January 10, 1998. Exhibit 4, p. 2. The evidence indicates that the policy was renewed, apparently in early January of 1998 and was effective on the date of Ms. Folks' accident, April 4, 1998. Exhibit 4, p. 1.

3. By letter dated April 9, 1998, State Farm informed Ms. Folks that she would be entitled to receive the P1 level of personal injury protection (PIP) benefits under Mr. McCune's insurance policy.

4. On April 15, 1998, Ms. Folks signed an Application for PIP Benefits and

---

[1] I refer to exhibits admitted at trial by their exhibit number (e.g., Exhibit 1).

returned it to State Farm.

5. Ms. Folks received PIP benefits for medical expenses and essential services totaling $104,000. Ms. Folks did not request and did not receive any wage loss payments.

6. On July 11, 2002, after State Farm had made all of the payments described above, State Farm informed Ms. Folks that she had exhausted the "P1" level of PIP benefits that was available to her.

7. In this lawsuit, Ms. Folks claims she is entitled to additional medical and rehabilitation benefits under the McCune policy, and she seeks reformation of the policy to provide additional benefits. She does not seek wage loss benefits or further essential services payments.

8. Exhibit 1, a document titled Your State Farm Car Policy, includes a description of PIP benefits and extended or additional PIP (APIP) benefits offered to Mr. McCune when he purchased the McCune policy. PIP benefits at the minimum required level are referred to in the policy as P1 benefits.

9. Exhibit 1 includes also an offer of APIP benefits that include higher levels of insurance coverage. *Exhibit 1*, p. 13.   Under the P4 and P8 levels of APIP coverage, Ms. Folks would be entitled to coverage for medical and rehabilitation expenses up to the $200,000 coverage limit contained in the policy. In addition, under the P4 and P8 levels of APIP coverage, there is no time limitation on coverage for medical expenses. Under the P1 level of coverage, medical expenses are covered only for five years.

10. Under the terms expressed in Exhibit 1, a State Farm insured is not permitted to purchase APIP benefits that would cover a pedestrian, unless the pedestrian also is the insured, the insured's spouse, or a relative of the insured. *Exhibit*

*1*, p. 12, section entitled "Limits of Liability," ¶ 1.  Thus, under the offer of APIP coverage made to Mr. McCune by State Farm, Mr. McCune was not permitted to purchase any level of APIP coverage that would cover a pedestrian who, like Ms. Folks, is not the insured, the insured's spouse, or a relative of the insured.  This exclusion of most pedestrians from APIP benefits is known as the Pedestrian Limitation.

     11.  Mr. McCune purchased PIP benefits at the P1 level, the minimum required level of PIP benefits.  Exhibit 4, p. 2.

     12.  Ms. Folks' accident-related arm and nerve injuries have been resistant to treatment and have required treatment over a long span of time.  On April 26, 2000, State Farm advised Folks that she had reached the basic medical benefits limits of $50,000 and gave her the option of "rolling over" her P1 rehabilitation benefits of $50,000 into her medical benefits, under Colo. Rev. Stat. §10-4-706.  Ms. Folks elected to do so, meaning she was entitled to coverage for up to $100,000 in medical benefits for five years after the accident.

     13.  On July 11, 2002, Ms. Folks exhausted all $100,000 in combined medical and rehabilitative payments. At this point, State Farm advised her and her medical providers that it would not make further payments for her medical expenses under the PIP provisions of the McCune policy.  Ms. Folks has continued to incur reasonable, necessary, and accident-related medical expenses since July 11, 2002.

     14.  If the P4 or P8 level of APIP coverages were applicable, Ms. Folks would be entitled to coverage for medical and rehabilitation expenses up to the $200,000 coverage limit contained in the policy, and there would be no five year limitation on the coverage of medical expenses.

## B. Relevant Legal Background & State Farm's Reaction

15. The Colorado statutes specifying the requirements for PIP and APIP benefits are part of the Colorado Auto Accident Reparations Act, part 7 of article 4 of title 10, C.R.S. (CAARA), repealed by §10-4-726, C.R.S. (2002), effective July 1, 2003. Although the CAARA has been repealed, the provisions of the CAARA control Ms. Folks' reformation claim against State Farm. The CAARA is known also as the No-Fault Act.

16. Beginning in 1987, Colorado law required insurance companies to offer additional PIP benefits, or APIP, with each auto insurance policy. §10-4-710, C.R.S. At the time Mr. McCune purchased his policy, and at the time of the accident involving Ms. Folks, §10-4-710 required Colorado auto insurers to offer APIP benefits that covered medical expenses and wage losses. Insurers were permitted, but not required, to put a monetary cap on APIP benefits. At the times relevant to this case, any cap on APIP benefits could not be lower than $200,000. §10-4-710(2)(b), C.R.S.

17. Under the CAARA, the purchase of APIP benefits was at the option of the insured.

18. On September 5, 1996, the Colorado Court of Appeals issued its decision in ***Thompson v. Budget Rent-A-Car Sys., Inc.***, 940 P.2d 987 (Colo. Ct. App. 1996). ***Thompson*** concerned an offer of APIP benefits that did not comply with the requirements of the CAARA. In ***Thompson***, the court held:

> When an insurer fails to offer the insured optional [APIP] coverage that it is statutorily required to offer, additional coverage in conformity with the required offer is incorporated into the agreement by operation of law.
>
> *   *   *   *
>
> Here, because Budget did not offer supplemental no-fault coverage as required by §10-4-710(2)(a), we conclude that such coverage was

5

automatically incorporated into the agreement. We further conclude that
    the driver's after-the-fact statement that he would have refused the
    additional coverage if it had been offered does not require a different
    result.

*Id*. at 990.

19. On January 8, 1998, the Colorado Court of Appeals issued its decision in ***Brennan v. Farmers Alliance Mutual Insurance Co.***, 961 P.2d 550 (Colo. Ct. App. 1998). The ***Brennan*** decision became final when the Colorado Supreme Court denied certiorari on August 24, 1998.

20. The key issue in ***Brennan*** was the application of APIP benefits to pedestrians:

    The pivotal question presented here is whether the No-Fault Act requires
    that extended PIP benefits purchased pursuant to §10-4-710 be payable
    to a pedestrian. We conclude that the terms of the No-Fault Act require
    that the insurer offer such coverage.

*Id*. at 552. In ***Brennan***, the insurance company had not offered APIP benefits that included pedestrians. *Id*. at 554. Given the defective offer of APIP benefits, the ***Brennan*** court held:

    (W)hen, as here, an insurer fails to offer the insured optional [APIP]
    coverage that satisfies the No-Fault Act, additional coverage in conformity
    with the offer mandated by statute will be incorporated into the policy. ***See
    Thompson v. Budget Rent-A-Car Systems, Inc.***, 940 P.2d 987
    (Colo.App.1996); ***see also 2 Couch on Insurance*** § 26:1 (L. Russ & T.
    Segalla 3d ed. 1995). Thus, the trial court's judicial reformation of the
    policy to reflect coverage of Joshua Brennan was correct.

*Id*. at 554. Joshua Brennan was a pedestrian who was injured when he was struck by a car insured by Farmers Insurance.

21. Shortly after the ***Brennan*** opinion was announced, State Farm directed its claims adjusters in Colorado to process PIP claims made by pedestrians as though the exclusion of pedestrians from APIP benefits was not included in the applicable

6

insurance contract. That is, if a policyholder had purchased APIP benefits, the pedestrian's claim was to be processed under the APIP level of coverage purchased by the policy holder. After **Brennan**, State Farm continued to follow a policy that pedestrians were not entitled to APIP benefits if the insured had not purchased APIP benefits and, instead, had purchased the P1 level of benefits, or basic PIP. This policy was applied to all pedestrian claims made under State Farm policies that were defective because the policy included the Pedestrian Limitation.

22. Ms. Folks' accident occurred on April 4, 1998, about three months after the **Brennan** decision was issued.

22. By November 1998, three months after the **Brennan** decision became final, State Farm had modified its automobile policy language in Colorado to eliminate the exclusion of pedestrians from APIP benefits. This change was made to comply with the mandate of **Brennan**.

23. After **Brennan**, State Farm was aware that its offer of APIP benefits in its Colorado auto insurance policies was not compliant with the mandates of the CAARA because the offer excluded pedestrians from APIP benefits. After **Brennan**, State Farm was aware also that under Colorado law, when an insurer fails to offer the insured APIP coverage that satisfies the No-Fault Act, additional coverage in conformity with the offer mandated by statute will be incorporated into the policy by operation of law.

24. There is no evidence that State Farm anticipated the **Brennan** decision.

25. Before **Brennan** – in light of the Division of Insurance's specific approval of its policy language – State Farm reasonably presumed its exclusion of pedestrians from APIP benefits to be valid.

26. On July 11, 2002, Ms. Folks exhausted all $100,000 in combined medical

7

and rehabilitative payments available under the P1 benefits in the McCune policy. At this point, State Farm advised her and her medical providers that it would not make further payments for her medical expenses.

26. On February 11, 2003, the United States Court of Appeals for the Tenth Circuit held that the *Brennan* decision applied retroactively to a pedestrian accident that occurred about 18 months prior to the *Brennan* decision. *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1242 (10th Cir. 2003). The parties refer to this ruling as *Clark I*. Prior to *Clark I*, it was not certain whether the *Brennan* rule applied retroactively to accidents that occurred prior to the *Brennan* ruling.

27. In *Clark I*, the Tenth Circuit remanded the *Clark* case to the district court for a determination of the proper date of reformation of the insurance contract at issue. On remand, United States District Judge Lewis T. Babcock concluded: (1) the effective date of reformation was the date of the court's reformation order; (2) Clark was entitled to the P4 level of PIP benefits; and (3) the statutorily-authorized aggregate limit of $200,000 on PIP benefits would be imposed on Clark's damages. *Clark v. State Farm Mut. Auto. Ins. Co.*, 292 F. Supp. 2d 1252 (D. Colo. 2003) (*Clark II*). On December 30, 2005, the Tenth Circuit affirmed all of Judge Babcock's rulings in *Clark II*. *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703 (10th Cir. 2005) (*Clark III*).

29. Shortly after the issuance of the *Clark III* decision on December 30, 2005, State Farm undertook a program to identify pedestrian claimants who might be entitled to APIP benefits based on the inclusion of the Pedestrian Limitation in the relevant State Farm policies. As a result of State Farm's program, 115 pedestrian claimants were identified as being potentially entitled to APIP benefits, and all were mailed notice that they might be entitled to APIP benefits. Sixty-five pedestrian claimants have received

APIP benefits as a result of this review process by State Farm.

31. Although Ms. Folks fit the criteria of State Farm's payment program, she did not receive APIP benefits as a result of the program. She was denied APIP benefits because, at that time, her claims had been adjudicated in this case to be time-barred. **Order and Memorandum of Decision** [#102] filed June 30, 2005. In 2008, the Tenth Circuit reversed that ruling, holding the Ms. Folks' claims are not time barred. *Folks v. State Farm Mut. Ins. Co.*, 299 F. App'x 748, 749 (10th Cir. 2008).

### III. CONCLUSIONS OF LAW

1. In *Clark I*, the Tenth Circuit identified certain factors relevant to the equitable determination of the effective date of reformation for the insurance policy at issue in *Clark*. Those factors include:

> (1) the degree to which reformation from a particular effective date would upset past practices on which the parties may have relied and whether State Farm anticipated the rule in *Brennan*;
>
> (2) how reformation from a particular effective date would further or retard the purpose of the rule in *Brennan*; and
>
> (3) the degree of injustice or hardship reformation from a particular effective date would cause the parties.

*Clark I*, 319 F.3d at 1243.

2. In *Clark II*, the district court properly summarized the source and purpose of the factors listed in *Clark I*.

> Clark's factors are "adapted from Colorado's test for determining whether a judicial decision should be applied retroactively." *Clark*, 319 F.3d at 1244 n. 6. Those factors were incorporated into Colorado law by *People ex rel. C.A.K.*, 652 P.2d at 607, and originate from *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106 - 07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). As *Clark* noted, *Brennan* relied upon a retroactivity analysis in affirming the trial court's decision to apply contract reformation prospectively. *Clark*, 319 F.3d at 1244 n. 6. Hence, *Brennan* and *Clark* encourage that a court undergo a retroactivity analysis before determining whether a contract

9

reformation should apply prospectively or retroactively.

***Clark II***, 292 F. Supp. 2d at 1260 - 1261.

3.  The ***Huson*** factors include:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ***see e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.***, supra, 392 U.S., at 496, 88 S.Ct., at 2233, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, ***see, e.g., Allen v. State Board of Elections***, supra, 393 U.S., at 572, 89 S.Ct., at 835. Second, it has been stressed that 'we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' ***Linkletter v. Walker, supra***, 381 U.S., at 629, 85 S.Ct., at 1738. Finally, we have weighed the inequity imposed by retroactive application, for '(w)here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity.' ***Cipriano v. City of Houma***, supra, 395 U.S., at 706, 89 S.Ct., at 1900.

***Chevron Oil Co. v. Huson***, 404 U.S. 97, 106-07 (1971).

3.  In determining the proper date of reformation, I consider ***Clark's*** adapted factors as well as the more general ***Huson*** factors.

### A. The degree to which reformation from a particular effective date would upset past practices on which the parties may have relied.

4.  In ***Clark II***, Judge Babcock described this factor as requiring consideration of the degree to which a particular reformation date upsets the parties' reliance on past practices and on the law as reasonably understood at the time. 292 F.Supp. 2d at 1261. If the law established unpredictable new obligations or resolved issues in a way that was not clearly foreshadowed, then reformation from an effective date that precedes the change in the law may

> dramatically upset past practices because the company's reliance would have been more reasonable. Conversely, a predictable or clearly

10

>foreshadowed rule would not upset past practices, as the parties could plan for the rule's consequence. Underlying this analysis is the obvious concern that any insurer must be able to calculate premiums on an actuarially sound basis so as to sustain its ability to pay future claims.

*Clark II*, 292 F.Supp.2d at 1267.

At the time of Ms. Folks' accident, which occurred on April 4, 1998, State Farm knew of the Colorado Court of Appeals' ruling in *Brennan*. At the time of the accident, the *Brennan* ruling was not final because the Colorado Supreme Court had not acted on the case. At minimum, the *Brennan* rule was clearly foreshadowed at the time of Ms. Folks' accident. The *Brennan* rule became final on August 24, 1998, a little more than four months after the accident. At that point in time, the basic requirements of *Brennan* were clear and predictable to State Farm.

When *Brennan* was final, State Farm knew that its offer of APIP coverage in the McCune policy was defective under the *Brennan* rule. State Farm knew also that when "an insurer fails to offer the insured optional coverage that it is statutorily required to offer, additional coverage in conformity with the required offer is incorporated into the agreement by operation of law." *Thompson*, 940 P.2d at 990; *Brennan*, 961 P.2d at 554. In addition, State Farm knew that a defective offer of APIP coverage mandated such reformation even if the insured said he or she would not have purchased APIP coverage if a proper offer had been made. *Thompson*, 940 P.2d at 990. These rules were established in *Thompson* in 1996, and their operation in the context of the Pedestrian Limitation was made clarion in *Brennan*. Thus, as of August 24, 1998, State Farm was aware that the McCune policy was subject to reformation to provide Ms. Folks with APIP benefits.

In *Clark II*, Judge Babcock reached a similar conclusion:

11

> In whole, *Brennan* was clear that where an offer was made for extended PIP benefits, and that offer did not include extended pedestrian coverage, the appropriate remedy is to incorporate extended coverage for the pedestrian regardless of the named insured's policy level selection.

*Clark II*, 292 F. Supp. 2d at 1263. Judge Babcock concluded also that State Farm could not rely reasonably on its post-*Brennan* practice of providing injured pedestrians with APIP coverage only if the policy holder had purchased APIP coverage. "This past practice of State Farm was not one upon which State Farm could reasonably rely because it required a strained interpretation of *Brennan*." *Id*. I agree with these conclusions and apply them here.

State Farm argues that it was not until the Tenth Circuit issued its opinion in *Clark III*, on December 5, 2005, that State Farm knew that any pedestrian insured under a policy containing the Pedestrian Limitation automatically would receive APIP benefits when the policy is reformed under the *Brennan* rule. As a matter of fact and law, I reject this argument. Considered together, *Thompson* and *Brennan* state clearly the rule of reformation applicable to policies containing the Pedestrian Limitation. In *Clark III*, the Tenth Circuit reviewed the rules in *Thompson* and *Brennan* and, quite predictably, concluded that the Pedestrian Limitation policy at issue in *Clark* was subject to reformation to provide APIP benefits to the pedestrian. In reaching this conclusion, the *Clark III* court simply cited and applied the rules established clearly in *Thompson* and *Brennan*. *Clark III* 433 F.3d at 710.

After the accident here, Ms. Folks obviously relied on McCune's State Farm insurance coverage as a source of compensation for her injuries. Of course, Ms. Folks could not have placed any reliance on the fact that McCune carried anything more than the legally mandated minimum level of coverage, which did not include APIP coverage.

However, it is equitable to conclude that Ms. Folks relied reasonably on State Farm, and insurance companies generally, to comply with applicable law in offering and providing the coverage available to her under the McCune policy and applicable Colorado law.

In these circumstances, the first factor weighs in favor of an earlier reformation date.  No doubt, State Farm needed a reasonable time to adjust to the **Brennan** rule, which was unexpected.  **Brennan** changed the rules somewhat, but the likely tenor of the new rules were clear at the time of Ms. Folks' accident, and those rules became firmly established when **Brennan** became final shortly after Ms. Folks' accident.  The **Brennan** rule was in effect when Ms. Folks first sought coverage from State Farm and did not change at any time relevant to this case.  Reformation of the McCune policy to include APIP benefits for Ms. Folks at any time after State Farm had a reasonable period to adjust to **Brennan** would not upset past practices on which State Farm relied reasonably. Notably, by November of 1998 State Farm had adjusted its policy terms to comply with **Brennan**.  This is a reasonable indication of the time reasonably necessary to adjust to **Brennan**.

### B. How reformation from a particular effective date would further or retard the purpose of the rule in **Brennan**.

5.  I agree with Judge Babcock's evaluation of how this factor should be applied.

The purpose of the rule in **Brennan** - which was not identified in **Clark** or **Brennan** - is one that is difficult to define.  Indeed, the rule itself is difficult to identify as "**Brennan** ... did not announce a new rule of procedure or substantive law." **Clark**, 319 F.3d at 1242.

    **Brennan** did do two things.  It "construed [the] CAARA to require that extended PIP benefits be payable to pedestrians."  **Id**.  And "[b]ecause that coverage was not offered to the insured, the court applied the rule established in **Thompson** to conclude that the insurance contract must be reformed to include extended PIP benefits for pedestrians." **Id**.  So, in order to define **Brennan's** "purpose," I look to the purposes of the rules **Brennan** applied:  the CAARA and **Thompson**.

13

***Clark***, 292 F. Supp. 2d 1266.

The purpose of the CAARA is to avoid inadequate compensation to victims of auto accidents. ***Brennan***, 961 P.2d at 553. Prompt compensation to victims of auto accidents is also a purpose of the CAARA. ***See, e.g., Allstate Ins. Co. v. Avis Rent-A-Car System, Inc.***, 947 P.2d 341, 346 - 347 (Colo. 1997). The general purpose of the Colorado Court of Appeals' holding in ***Thompson*** is to reform policies that violate the requirements of the CAARA to assure that the policy satisfies the statutory minimums. ***Thompson***, 940 P.2d at 990.

The mandate of ensuring prompt and adequate compensation to victims of auto accidents augurs for an earlier reformation date. Ensuring that insurance coverage meets statutory minimums involves providing a deterrent for insurance companies that fail to offer or provide coverage that meets statutory minimums. An earlier reformation date tends to be more expensive for the insurance company, and thus tends to provide a deterrent and an incentive. However, "(t)hat incentive works only where interpretations are predictable or foreshadowed." ***Clark II***, 292 F. Supp. 2d at 1267.

In this case, two rules of the CAARA are primary considerations. First, the CAARA required that pedestrians be included in APIP coverage. As discussed above, the development of this rule was somewhat unpredictable, but that unpredictability does not play a significant role in this case. This is true primarily because the ***Brennan*** rule was in effect before Ms. Folks' accident. Reformation of the McCune policy to provide APIP coverage ensures enforcement of the rule that pedestrians be included in APIP coverage.

Second, adequate and prompt compensation of auto accident victims also is a relevant purpose of the CAARA. Presumably, the Colorado legislature considered the

14

coverage levels provided in the CAARA to be adequate. Thus, the key consideration is prompt compensation of Ms. Folks in the amount mandated by the CAARA and related case law, primarily **Thompson** and **Brennan**. Ms. Folks does not contend that State Farm failed promptly to pay her the first $100,000 in benefits she received under the P1 PIP coverage provided in the McCune policy. Her P1 coverage was not exhausted until July 11, 2002. Under a reformed policy, Ms. Folks will be entitled to APIP coverage at the P4 or P8 level. Under either of these APIP coverages, Ms. Folks is entitled to an additional $100,000 in benefits with no limitation on the time period to which the coverage is applicable. Under these circumstances, it is only after July11, 2002, that State Farm arguably failed promptly to pay APIP benefits due to Ms. Folks.

Ms. Folks filed this case on February 9, 2004. State Farm argues that it reasonably refused to pay APIP benefits to Ms. Folks when it argued reasonably that Ms. Folks claims in this case were time barred, *a fortiori*, when State Farm had the benefit of a ruling by a United States District Court holding that Ms. Folks claims were, in fact, time barred. In State Farm's view, this period of time runs from roughly February 2004, when Ms. Folks filed this case, through November 2008, when the Tenth Circuit held that Ms. Folks' claims are not time barred. Given the ultimate resolution of the time bar issue in favor of Ms. Folks, I conclude that this period of time carries little or no weight in determining an appropriate date for reformation. Rather, this period of time is relevant to a determination of the penalty, if any, State Farm should pay for the delay in providing APIP benefits to Ms. Folks.

On balance, I conclude that the second factor weighs in favor of a reformation date no earlier than the date on which State Farm first refused to provide Ms. Folks with APIP benefits, July 11, 2002. Prior to that date, Ms. Folks received timely coverage

from State Farm. Reformation prior to this date would not serve the purpose of ensuring that Ms. Folks promptly receives the APIP coverage to which she is entitled. However, reformation on or after this date, the date on which APIP coverage first was at issue, serves the purpose of adequate and prompt compensation of Ms. Folks.

### C. The degree of injustice or hardship reformation from a particular effective date would cause the parties.

6. State Farm contends it would be unjust to reform the McCune policy on a date prior to the time that State Farm became aware that the Pedestrian Limitation in the McCune policy would require reformation of the policy to include P4 or P8 coverage for Ms. Folks. I agree that, via reformation, State Farm should not be required to comply with a legal rule until the point in time when it reasonably should have known of the rule and its effect on the McCune policy. To rehearse, by August of 1998, State Farm was aware of the *Brennan* rule and was aware that the *Brennan* rule required reformation of the McCune policy to include APIP benefits for Ms. Folks. I reject State Farm's contention that it did not have this awareness until the *Clark III* opinion was issued.

State Farm argues also that industry standards and practices can't change overnight, even though a legal rule changes. No doubt that is true. Thus, the date of reformation of the McCune policy should allow for a reasonable period of time for State Farm to adjust its practices to the *Brennan* rule. I conclude that point in time was the end of 1998, approximately four months after *Brennan* became final. By this time, State Farm had adjusted its policy terms to accommodate *Brennan*. In addition, following the *Clark III* decision, State Farm took action to reform its claims handling practices, which policy reformation was accomplished in a relatively short period of time. These facts show that, had State Farm applied the rule stated in *Brennan* shortly after

16

***Brennan*** became final, State Farm could have adjusted its claims handling practices to accommodate that rule by the end of 1998.

The date on which APIP benefits actually were payable to Ms. Folks carries significant weight in evaluating the third factor. As discussed above, the medical benefits sought by Ms. Folks did not rise above the P1, or basic PIP, level of benefits until July 11, 2002. Thus, APIP benefits for Ms. Folks were not actually at issue until July 11, 2002. It would not be equitable to reform the McCune policy prior to the time the APIP benefits in question actually were at issue. Notably, in closing argument, Ms. Folks argued for reformation as of July 11, 2002, the date her P1 benefits were exhausted and the date she sought additional coverage under the APIP benefits in the McCune policy.

State Farm asserts that Ms. Folks failed to cooperate with State Farm's efforts to provide her with APIP benefits when, in 2009, Ms. Folks failed to provide certain information about her medical bills to State Farm, despite State Farm's request for additional information. To the extent the evidence supports State Farm's claim that Ms. Folks failed to cooperate, I conclude this contention carries little weight in determining an equitable date of reformation. By 2009, Ms. Folks' claim for APIP benefits had been in litigation for about five years. In that context, any failure to provide State Farm with information via State Farm's claims processing procedures carries little weight. However, this factor may be relevant to a determination of the penalty, if any, State Farm should pay for the delay in providing APIP benefits to Ms. Folks.

On balance, I conclude that this third factor weighs in favor of a reformation date of no earlier than July 11, 2002. This is the date on which APIP benefits became payable to Ms. Folks. Reformation prior to this date might, in effect, subject State Farm

to penalties for failure to pay APIP benefits to Ms. Folks prior to the date on which APIP benefits were actually payable. Prior to this date, State Farm had paid P1 benefits to Ms. Folks in a timely fashion. Given this context, the fact that State Farm knew and understood the rules in **Thompson** and **Brennan** long before July 11, 2002, carries little weight in assessing injustice and hardship to State Farm. Finally, I conclude that reformation as of July 11, 2002, would not impose any significant injustice or hardship on Ms. Folks.

### D. Conclusion - Reformation Date

7. Weighing the three **Clark I** factors, and all of the equities in this case, I conclude that a reformation date of July 11, 2002, is most inequitable. By July 11, 2002, State Farm was aware of all of the key considerations at issue here. State Farm had been aware for some time of the rules in **Thompson** and **Brennan**. State Farm was aware that a policy containing the Pedestrian Limitation was subject to reformation to provide "additional coverage in conformity with the offer mandated by statute . . . . " **Brennan**, 961 P.2d at 554. State Farm was aware that the offer mandated by statute was an offer of APIP coverage that included pedestrians. State Farm was aware that the McCune policy included the unlawful Pedestrian Limitation. Given all of this, State Farm was aware that, with regard to Ms. Folks, the McCune policy was subject to reformation to provide Ms. Folks with APIP benefits. July 11, 2002, is the date on which Ms. Folks exhausted her basic PIP benefits and first became entitled to APIP benefits under the McCune policy. Given these circumstances, reformation as of July 11, 2002, would not upset past practices on which the parties relied, would further the purposes of the CAARA and the case law interpreting the CAARA, and would not impose any inequitable injustice or hardship on Ms. Folks or State Farm.

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That plaintiff Roberta Folks' claim for reformation of the State Farm policy is **RESOLVED** by the court's reformation of the State Farm policy as provided in the following orders;

2.  That the State Farm policy under which Ms. Folks is entitled to benefits is **REFORMED** to provide APIP benefits as of July 11, 2002;

3.  That the State Farm policy is **REFORMED** to include the permissible cap on APIP benefits of $200,000; and

4.  That, as previously set, trial by jury on Ms. Folks' remaining claims **SHALL COMMENCE** on Monday, September 24, 2012, at 8:30 a.m.

Dated September 11, 2012, at Denver, Colorado.

**BY THE COURT:**

*Bob Blackburn*
Robert E. Blackburn
United States District Judge

19